UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ANGELA CALLOWAY                                                                              PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:04-CV-389-S

UNIVERSITY OF LOUISVILLE, et al.                                                             DEFENDANT

### MEMORANDUM OPINION

This matter is before the court on the motion for summary judgment by the defendant, University of Louisville ("the University"), and all remaining individually named defendants. This case involves the plaintiff's claims of employment discrimination under the Americans with Disabilities Act (42 U.S.C. §12101, *et. seq.*). For the reasons set forth below, the court will grant the defendants' motion for summary judgment.

### FACTS

The plaintiff, Angela Calloway ("Calloway"), became employed as a clinical research coordinator in the University's neurology department in August of 2003. Three months later, she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). Calloway claims that, beginning in March 2004, she began to be harassed by a co-worker, Pat Wolf, because of this condition. Specifically, Calloway claims that, on March 17, 2004, she had a conversation with Wolf in which Wolf mentioned Calloway's health problems. Calloway had called in sick on the prior day and needed to reschedule her meetings with certain patients participating in a study. Wolf indicated that Calloway should not be rescheduling patients who need to see a doctor because she could not

1

expect the doctor to work in these patients on short notice. Calloway and Wolf had an allegedly heated telephone conversation regarding this on March 16, 2004.

When Calloway returned to work the following day, the two resumed their conversation. Calloway claims that Wolf told her, "I know you have health problems but that does not give you the right to not do your job." Plaintiff's Response (DN 37), Exhibit E, p. 2. Calloway made informal complaints with her supervisor and the University's Human Relations Office. She claims that her co-workers and supervisors began treating her more formally after this incident and that she suffered severe anxiety from an increasingly hostile work environment.

In late March of 2004, Calloway requested, and was denied, part-time work in the neurology department. The University maintains that there was no such available work. Calloway then requested paid leave under the Family Medical Leave Act (FMLA) because of what she described as overwhelming stress and an allegedly hostile work environment. This request was denied because Calloway had not been employed for twelve months, as required by the statute. She then requested unpaid leave, which was denied as well. While her requests were pending, Calloway was not reporting for work. When the University denied her last request, it notified Calloway that she needed to return on or before April 12, 2004.

After this deadline passed, Calloway went to the neurology department and turned in her keys to Dr. Michael Gruenthal. The University claims that no decision had been made regarding Calloway's employment and that her resignation was considered voluntary. Calloway claims she assumed that, since she was unable to return to work by the deadline, she would be terminated.

In late April of 2004, Calloway applied for a graduate student research assistantship with the University. She interviewed with Dr. Robert Topp, Associate Dean for Research. He indicated that, at the time of her interview, she was the only applicant to date. The deadline for applications was

2

extended and when Calloway inquired into her status, Topp indicated that he was still interviewing candidates and that he needed to investigate whether her prior issues with the Neurology Department would pose any problem in hiring her. Calloway ultimately did not receive the assistantship and now alleges that the University refused to rehire her in retaliation for her prior complaints.

In June 2004, Calloway filed a formal discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that the University denied her requested leave and discharged her because of her disability and that she was also subjected to a hostile work environment because of such disability. The EEOC dismissed the complaint, finding no discrimination. Upon receiving her "right to sue" letter, Calloway filed the instant action. Calloway asserts various claims in her complaint, including disability discrimination, hostile work environment, constructive discharge, retaliation and violations of her right to privacy regarding certain health care information.

STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears the burden of establishing these elements *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Not every factual dispute between the parties prevents summary judgment. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). To preclude summary judgment, the disputed facts must be material, such that "they might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The dispute must also be genuine, such that "if the facts were proven at trial, a reasonable jury could return a verdict for the non-moving party." *Id.* "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but

3

that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp.*, 822 F.2d at 1435. In making these determinations, the court views all facts and inferences in a light most favorable to the nonmoving party. *Id.*

DISCUSSION

I. Disability Discrimination

Calloway alleges that she was discriminated against based upon her disability.[1] Calloway points to her March 17, 2004 conversation with Wolf as evidence to support her disability claim. She claims that Wolf mentioned Calloway's health problems and expressed doubt that she could perform her job duties. Calloway interpreted Wolf's statements to mean that Calloway would be fired because of the side effects she suffered from the ADHD medication. *See* Plaintiff's Response (DN 37), p. * 5. However, Wolf had no power to fire her and the record is devoid of any evidence that there were any plans to fire Calloway. Calloway Depo., p. 58-59. It is well established that "isolated and ambiguous comments" do not adequately support a finding of discrimination. *Phelps v. Yale, Sec., Inc.,* 986 F.2d 1020, 1025-26, (6th Cir. 1993). Accordingly, Wolf's statements are insufficient to directly establish discrimination.

In the absence of direct evidence, Calloway may rely upon the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this model, Calloway must first show that she was (1) disabled; (2) subjected to an adverse employment action; (3) otherwise qualified; and (4) treated differently than similarly situated employees for the

---

[1] The University notes that while Calloway filed this suit pursuant to Title VII of the Civil Rights Act of 1964, she should have done so under the Americans with Disabilities Act ("ADA") because Title VII does not address disability discrimination. Nonetheless, the parties have briefed the issue as if the claim were properly asserted under the ADA.

4

same or similar conduct. *Id. See also Kocsis v. Multi-Care Management, Inc.,* 97 F.3d 876, 882-83 (6th Cir. 1996). Then the burden of production would shift to the University to provide a legitimate, nondiscriminatory reason for its action.[2] *McDonnell Douglas,* 411 U.S. at 802. The ultimate burden of persuasion rests with Calloway to establish that the University's proffered reasons were merely pretext for discrimination. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed. 207 (1981).

Under the ADA, a person is disabled who (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment or (3) is regarded as having such an impairment. *See* 42 U.S.C. §12102(2). Calloway identifies her disability as ADHD, also noting that the medication she takes for this disorder causes some side effects and that she later developed generalized anxiety disorder as an acute exacerbation of her ADHD. The University does not dispute that she suffers from ADHD or the side effects of the medication she used to treat her learning disability. However, determining whether a physical or mental impairment exists is only the first step in determining whether an individual is disabled. Many impairments do not impact an individual's life to the degree that they constitute disabling impairments. *See, e.g, Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002) ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.").

To qualify as disabling, the impairment must substantially limit one or more major life activities. As an initial matter, it is necessary to understand what is meant by the terms "major life

---

[2] To reach this step, the court would have to conclude that the University did, in fact, take an adverse employment action against Calloway. The University strongly argues against such conclusion.

activities" and "substantially limit." The EEOC regulations shed light on this: "'major life activities' means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i). Furthermore, the term "'substantially limits' means . . . unable to perform a major life activity that the average person in the general population can perform . . ." 29 C.F.R. §1630.2(j)(1)(i). Calloway identifies the major life activities in which she is limited as "thinking" and "working." *See* Plaintiff's Response (DN 37), p. * 9. While concentration does not qualify as a major life activity, working does. *See Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir. 1999); *Doren v. Battle Creek Health System*, 187 F.3d 595, 597 (6th Cir. 1999). With respect to working, however, substantially limits means an "inability to work in a 'broad range of jobs' rather than a specific job." *Toyota Motor Mfg.*, 534 U.S. at 200 (quoting *Sutton v. United Air Lines*, *Inc.,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

Calloway explains that her ADHD makes it difficult to "plan ahead" and "complicates learning" for her. Calloway Depo., pp.42-43. When asked how her disability affected her job performance at the University, however, she states that it had no effect on her ability to perform her duties, except that "scheduling was kind of a tough thing." Calloway Depo., p. 43. She claims that she was able to perform her duties "above and beyond" what was required and that she needed no accommodations in order to adequately perform her job duties. Calloway Depo., p. 44. There is no evidence in the record to support the idea that she cannot adequately perform in a broad range of jobs. In fact, according to her own deposition testimony, Calloway's ADHD did not substantially limit her ability to work. Thus, she is not disabled within the meaning of the ADA. There is also insufficient evidence to support that she had a record of having, or that the University regarded her as having, such a substantially limiting disability.

6

As mentioned earlier, one of the elements Calloway must demonstrate is that she suffered an adverse employment action. The University maintains that Calloway suffered no such adverse employment action, arguing that she was not terminated but actually resigned voluntarily.[3] Motion for Summary Judgment (DN 36), p. 8. Calloway may establish an adverse employment action, however, by demonstrating that she was constructively discharged even if that discharge was officially deemed a resignation. *See Logan v. Denny's, Inc*., 259 F.3d 558, 568 (6th Cir. 2001). Calloway clearly claims that she was constructively discharged. Complaint (DN 1), ¶ 8. She maintains that the letter denying her requested leave and requiring her return to work on April 12, 2004 effectively discharged her because she was not able to return to work at that time. Calloway Depo., pp. 97-98.[4]

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir.1999). In determining whether the circumstances were such that a reasonable person would have felt compelled to resign, the court examines many relevant factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris v. Forklift Sys*., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The

---

[3] The University has effectively established that Calloway was not technically terminated, but rather that her employment ceased when she voluntarily turned in her keys.

[4] "I asked for sick leave. They wouldn't give it to me. They gave me a deadline to come back to work. I wasn't able to come back to work on that deadline, and I assumed to be terminated at that point since I didn't make the deadline to return." Calloway Depo., p. 95.

analysis for constructive discharge is very similar to that of a hostile work environment claim.[5] *See e.g, Goldmeier v. Allstate Ins. Co.,* 337 F.3d 629, 635 (6th Cir. 2003) (referencing hostile work environment standards in the context of a constructive discharge claim). A hostile work environment claim is actionable "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal quotations omitted).

Under these standards, the University did not expose Calloway to a work environment so hostile and abusive as to compel a reasonable person to quit, rather than tolerate the environment. Calloway specifically says that the only person who was hostile towards her because of her disability was Wolf and that she was only hostile during the confrontation on March 17, 2004. She claims that people in her department became hostile towards her only after this confrontation with Wolf; and even Calloway does not attribute this hostility to her ADHD. Calloway Depo., pp. 44-45. She has stated that her employment situation caused her overwhelming stress, but she has failed to articulate anything more specific. The record is devoid of any details demonstrating that Wolf or the other co-workers exhibited behavior so severe as to alter the conditions of Calloway's employment. The actions complained of by Calloway simply do not rise to the level required of a hostile work environment or constructive discharge claim.

Calloway's constructive discharge claim also "fails independently for lack of evidence that [the University] 'deliberately create[d] intolerable working conditions ... with the intention of forcing' [her] to quit." *Goldmeier v. Allstate Ins. Co.,* 337 F.3d 629, 636 (6th Cir. 2003) (citing *Moore*,

---

[5] Calloway has made a claim for both constructive discharge and hostile work environment.

171 F.3d at 1073). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moor*e, 171 F.3d at 1080. Calloway can establish such an intent "by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Id.* She has failed to do so. There is no evidence in the record establishing such an intent by University officials. In fact, Calloway admitted that the University did not place her in the "Do Not Rehire" category and that the University welcomed her to reapply for any position she wished. Calloway Depo., p. 99. She has not produced sufficient evidence to establish that the University deliberately created a situation designed to provoke Calloway's resignation.[6]

Finally, Calloway has produced no evidence that similarly situated persons were treated differently than her. Thus, she has failed to establish the requisite elements of her *prima facie* case. She has not demonstrated that she was disabled within the meaning of the ADA, that an adverse employment action was taken against her or that she was treated differently than others similarly situated. Accordingly, the court will grant the defendants' motion for summary judgment on the disability discrimination claims.

## II. Retaliation

Calloway raises various claims of retaliation as well. Following her conversation with Wolf on March 17, 2004, Calloway made what she characterizes as "non-formal complaints" to the Employee Relations Office as well as to her direct supervisor, citing what she describes as

---

[6] Calloway also cites the denial of her request for leave as an act of discrimination and notes that it may violate the ADA as a failure to accommodate. These claims also fail because, as discussed above, Calloway was not an individual with a disability. She did not request leave as "an accommodation" for her purported disability and only now characterizes her request as such. Furthermore, she was not eligible for paid leave under FMLA because she had not worked at the University for the required twelve month period and the University determined that allowing her temporary unpaid leave would constitute an undue hardship.

"discriminating remarks" about her ADHD. Complaint (DN 1), ¶ 9. She claims that this led to retaliation in the form of a hostile work environment and eventual constructive discharge.[7] Calloway also claims that the University retaliated against her for "blowing the whistle" when she notified officials that she believed University hospital procedures were discriminatory against black stroke patients. Finally, she claims that the University retaliated against her by refusing to hire her for a research assistantship in May of 2004.

In order for federal courts to have subject matter jurisdiction over suits brought under employment discrimination statutes such as the ADA, the claimant must first unsuccessfully pursue administrative relief. Thus, if Calloway did not first present her claims to the EEOC, those claims may not be brought before this court. *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 545 (6th Cir. 1991) (citations omitted). The federal court action must be limited "to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *EEOC v. Bailey Co., Inc.,* 563 F.2d 439, 446 (6th Cir. 1977) *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978). When a complainant is proceeding *pro se*, "[c]ourts require a broad reading of the charge" because such complainants "are unschooled in the technicalities of the law" *Ang*, 932 F.2d at 546 (citations omitted). "Courts have held that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Id.* at 546-47. (internal quotations omitted).

---

[7] We have dismissed the underlying substantive claims above. The question of whether the University retaliated against Calloway for engaging in any activity that is protected under the ADA, however, is an entirely separate inquiry.

The rationale for such a rule, however, is not applicable to the situation at bar. "Because retaliation claims, by definition, arise after the filing of the EEOC charge, this rule promotes efficiency by requiring only one filing." *Id.* at 546. Calloway's retaliation claims involve "conduct occuring prior to the filing of the EEOC charges and thus could have been alleged in the original charge." *Id.* She lodged her informal complaints with her supervisor and with the Employee Relations Office in March of 2004. Plaintiff's Response (DN 37), pp. 5-8, Exhibits E, F, I. Calloway turned her keys in late April 2004. Calloway Depo., p. 98. Her refusal to rehire retaliation claim stems from events occurring in April and May of 2005, when she applied for a research assistantship with the University. Her last communication with Topp, the hiring official, regarding the research assistantship is dated May 25, 2004. *See id.,* Exhibit K, Email Correspondence between Calloway and Topp. She filed her EEOC complaint more than three weeks later on June 17, 2004. Complaint (DN 1), EEOC Charge.

She also theorizes that the discriminatory remarks made by Wolf, the creation of the hostile work environment and her constructive discharge all occurred in retaliation for her "blowing the whistle" regarding treatment of black stroke patients. Plaintiff's Response (DN 37), at p. * 4; Calloway Depo., p. 46. Calloway claims that the University hospital employees drug screen black patients at a higher rate than white patients and that the screening wastes valuable time in treatment of stroke patients. Calloway brought this to the attention of University employees "on more than one occasion" between September of 2003 and February of 2004. Plaintiff's Response (DN 37), p. * 2. On February 27th, 2004, she presented a case study regarding these alleged inadequacies in treatment. *See id.* at p. * 3.

All of the events forming the factual basis for her retaliation claims precede the filing of her EEOC complaint. "Retaliatory conduct occurring prior to the filing of the EEOC complaint is

11

distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint." *Ang,* 932 F.2d at 547. Calloway was aware of all the conduct from which her retaliation claims stem; yet, she made no mention of her retaliation claims in the factual portion of the EEOC complaint, nor did she check the box for retaliation. Thus, those allegations are not within the scope of an investigation reasonably related to her charge of disability discrimination. *See id.* at 546. Because she did not exhaust her administrative remedies on the retaliation claims, the court lacks subject matter jurisdiction and must grant the University's motion for summary judgment on these claims.

Calloway asserts one retaliation claim stemming from events occurring after the filing of her EEOC complaint. Calloway indicates that she filed a complaint with the Office of Civil Rights ("OCR") in October of 2004. *See* Plaintiff's Response (DN 37), Exhibit A. In this OCR complaint, which purports to be on behalf of black stroke patients, Calloway claims that University hospital employees discriminate against black patients by drug screening them more frequently than their white counterparts.

This claim is not within the scope of an investigation of the EEOC charge as there was no mention of the stroke study. Thus, Calloway failed to exhaust her administrative remedies on this claim as well. Furthermore, this claim fails on its face because there was no action taken against her after the filing of her OCR complaint. To meet her initial burden on a retaliation claim, Calloway must establish the following elements of her *prima facie* case: 1) that she engaged in ADA protected activity; 2) that the University was aware of the exercise of her protected rights; 3) that the University subsequently took an adverse employment action against her; and 4) that there was a causal connection between the protected activity and the adverse employment action. *See, e.g., Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 (6th Cir. 2001) (citing *Morris v. Oldham County Fiscal*

12

*Court*, 201 F.3d 784, 792 (6th Cir. 2000)); *Orell v Umass Mem'l Med. Ctr. Inc.,* 203 F.Supp.2d 52, 60 (D.Mass 2002).

First, this complaint does not constitute activity protected under the ADA. In fact, Calloway specifically cites racial discrimination as the basis for claim. Furthermore, this OCR complaint was made on October 13, 2004 – more than five months after Calloway's employment ended and nearly five months after she was denied the research assistantship. The actions of which Calloway complains (namely, hostile work environment, constructive discharge, denial of benefits and refusal to rehire) could not possibly have been made in retaliation for this complaint because it had not yet been filed. Accordingly, the court will grant the defendants' motion for summary judgment on all Calloway's retaliation claims.

### III. Violation of Privacy

Calloway also claims that the University violated her right to privacy as it concerns certain medical information. On March 27th, 2004, Calloway submitted a request for leave under FMLA. She was not eligible, however, because she had not been employed by the University for the requisite twelve month period. 29 U.S.C. §2611(2). Calloway then sought leave without pay and was informed by Ronald Smith, Research Manager for the Neurology Department, that she must submit a "fitness for duty letter" from her medical professional indicating that Calloway was unable to perform her job duties. Smith explained the process via letter to Calloway dated March 29, 2004. In that letter, he included a release form authorizing Calloway's medical professional to discuss the "fitness for duty" evaluation with University employees, namely Malinda Durbin who worked in the Human Resources Department.

On March 31, 2004, Wanda Scalo, LCSW sent a letter to Durbin indicating that Calloway was under her care and that she was unable to function in her current work situation, which she had

described as "hostile." Scalo recommended that Calloway "have 30 days off work to regain her physical and mental health." Plaintiff's Response (DN 37), Exhibit J, March 31, 2004 Letter from Scalo. Following receipt of this letter, Durbin contacted Dr. Emily Strapp's office, where Scalo worked. Durbin sought clarification of Calloway's ability to perform her duties and specifically asked for a medical diagnosis. Dr. Strapp herself then sent an addendum to the first letter.

Calloway maintains that Durbin violated her rights to privacy by contacting Dr. Strapp's office about this issue. Calloway has set forth no allegation that Durbin did anything improper under any particular health information privacy acts. In fact, it seems that Durbin was merely doing her job while investigating and considering Calloway's request for leave. As noted earlier, Smith's letter to Calloway indicated that Durbin would be discussing the situation with Calloway's health provider. Calloway has produced no evidence that Durbin or any other University employee violated Durbin's right to privacy. Accordingly, the court will grant the University's motion for summary judgment on this claim as well.

For the reasons set forth above, the court will grant the defendants' motion for summary judgment on all claims in this case. A separate order will be entered herein this date in accordance with this opinion.

cc: Counsel of Record